**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GOLDEN BRIDGE TECHNOLOGY, INC. ) | |
| ) | |
| *Plaintiff,* ) | C.A. No. |
| ) | |
| vs. ) | |
| ) | **JURY TRIAL DEMANDED** |
| HTC CORP. (A/K/A HIGH TECH COMPUTER ) | |
| CORP.), HTC (BVI) CORP., HTC AMERICA ) | |
| INC., AND EXEDEA INC. ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

For its Complaint against HTC Corp. (a/k/a High Tech Computer Corp.), HTC (BVI Corp., HTC America Inc., and Exedea Inc. (collectively referred to as "Defendants" or "HTC"), Plaintiff Golden Bridge Technology, Inc. ("Plaintiff or "GBT") alleges as follows:

**THE PARTIES**

1. Plaintiff Golden Bridge Technology, Inc. is a corporation duly organized and existing under the laws of the State of New Jersey, with its principal place of business at 198 Brighton Avenue, Long Branch, New Jersey 07740. GBT is the owner, by assignment, of all right, title and interest to U.S. Patent No. 6,075,793 entitled "High Efficiency Spread Spectrum System and Method" ("the '793 patent" or "the Patent-in-Suit"). GBT's ownership of the '793 patent includes the rights to enforce and license the patented technology.

2. Defendant HTC Corp. a/k/a High Tech Computer Corp. ("HTC Corp.") is a Chinese corporation with its principal place of business located at No. 23, Xinghua Rd., Taoyuan City, Taoyuan County 330, Taiwan, Republic of China.

3. Defendant HTC (B.V.I.) Corp. ("HTC BVI") is a wholly-owned subsidiary of Defendant HTC Corp. and is incorporated under the laws of the British Virgin Islands with its principal place of business at 3F, Omar Hodge Building, Wickhams Cay I, P.O. Box 362, Road Town, Tortola, British Virgin Islands. Defendant HTC BVI is engaged in global investing and related activities on behalf of its parent, Defendant HTC Corp., and is itself a parent company of additional named defendants.

4. Defendant HTC America, Inc. ("HTC America") is a wholly-owned subsidiary of Defendant HTC BVI and is incorporated under the laws of the State of Washington, with its principal place of business at 13920 SE Eastgate Way, Suite 400, Bellevue, Washington 98005. HTC America's registered agent for service of process is the National Registered Agents, Inc., 16055 Space Center Blvd., Suite 235, Houston, Texas 77062.

5. Defendant Exedea, Inc. ("Exedea") is a wholly-owned subsidiary of HTC BVI and is incorporated under the laws of the State of Texas with its principal place of business at 5950 Corporate Drive, Houston, Texas 77036. Exedea's registered agent for service of process is HTC USA Inc., 5950 Corporate Drive, Houston, Texas 77036-2306. Defendants HTC Corp. a/k/a High Tech Computer Corp., HTC (B.V.I.) Corp., HTC America, Inc., and Exedea, Inc. are hereinafter collectively referred to as "HTC".

## NATURE OF THE ACTION

6. In this civil action, Plaintiff seeks damages against Defendants for acts of patent infringement in violation of the Patent Act of the United States, 35 U.S.C. §§ 1 et seq.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction of such federal question claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8. Venue is proper under 28 U.S.C. §§ 1391(b) and/or (c) and 1400(b), in that the acts and transactions complained of herein were conceived, carried out, made effective, or had effect within the State of Delaware and within this district, among other places. On information and belief, Defendants conduct business activities in this judicial district including regularly doing or soliciting business, engaging in conduct and/or deriving substantial revenue from goods and services provided to consumers in the State of Delaware and in this district. Furthermore, upon information and belief, one or more Defendants are registered to do business with the Delaware Secretary of State.

9. On information and belief, this Court has personal jurisdiction over the Defendants. Each of the Defendants conducts continuous and systematic business in Delaware and in this district by offering to sell and/or selling mobile devices and/or 3G wireless services in this State in this district.

**BACKGROUND OF THE DEVELOPMENT OF 3G WIRELESS NETWORKS**

10. The efficiency and quality of the wireless communication networks have seen extraordinary improvements over the past few decades. Although prototypes of cell phones existed as early as the 1940s, cell phones were not commercially marketed in the United States until the early 1980s. The first cell phone cost almost $4,000 per unit and operated on an analog network (also known as the First Generation or "1G" network). Analog networks were notoriously slow and users of the analog networks often experienced distorted voices and call interferences.

11. In the early 1990s, a set of standards defining the Second Generation or "2G" network was introduced. The 2G digital network came with many advantages including increasing the capacity of the telecommunications system by allowing digital voice calls to be

compressed, thereby using available bandwidth more efficiently. The 2G network also allowed data transmission, enabling users to transmit text messages from one mobile phone to another mobile phone.

12. Continued improvements to the 2G network were made, including, for example, the 2.5G network and the 2.75G (EDGE) network, both of which improved upon the abilities to use mobile phones to receive and transmit more advanced types of data including photos, email and the internet.

13. Today, the third generation of wireless network standards, also known as "3G", has been widely deployed and is currently in use. A 3G compliant network provides high speed bandwidth to handheld devices, including mobile phones, as well as other types of transmission/reception devices such as electronic readers, "smart phones", and laptop cards. The 3G network expands the utility of wireless phones and other 3G compatible devices because it allows users to conduct tasks more quickly than in the past, including viewing video, downloading books and magazines, sending and receiving text and multimedia messages, as well as making and receiving voice calls. The advent of the 3G network allows users to watch mobile TV on demand, conduct video conferencing, and utilize location based services which allow users to find businesses or contacts nearby. 3G also allows users to simultaneously use voice and data services, allowing users to browse the internet and conduct a voice call at the same time from the same device.

## THE GLOBAL STANDARDIZATION OF 3G NETWORKS

14. 3G is a compilation of technologies, the standards for which are articulated by the International Telecommunication Union ("ITU"), a global standards setting organization. The ITU, through the International Mobile Telecommunications-2000 (IMT-2000) initiative

mandated the necessity of, and the requirements for, a single global wireless standard.  Many groups and committees worked together to develop mobile phone systems that are compliant with IMT-2000.  Those groups included the Telecommunications Industry Association ("TIA") and the European Telecommunications Standards Institute ("ETSI").

15. In or around late 1998, various regional standards organizations and committees, including ETSI, formed a standards setting group with the purpose of creating uniform standards for 3G wireless networks and the Wideband Code Division Multiple Access/Universal Mobile Telecommunications System (known as WCDMA/UMTS or sometimes just UMTS) that were compliant with the IMT-2000.  This standards setting organization was named the Third Generation Partnership Project ("3GPP").

16. Currently, all 3G networks claiming to be UMTS compliant must comply with the IMT-2000 global initiative as articulated by 3GPP.

17. UMTS improved upon previous platforms by efficiently supporting increased speeds and capacity, thereby allowing even more robust uses of mobile devices.

### GBT'S CONTRIBUTIONS TO THE TELECOMMUNICATIONS STANDARDS REQUIRED BY THE IMT-2000 AND ARTICULATED BY 3GPP FOR 3G NETWORKS

18. GBT's '793 patent, also known as the "Multicode patent," relates to 3G compliant mobile devices utilizing UMTS compliant technology.

19. The technology claimed in the '793 patent was developed by GBT, an innovator in the mobile telecommunications field.

20. Founded in 1995, GBT was formed for the purpose of developing wireless solutions.  Originally, GBT focused upon developing solutions relating to making wireless connections to broadband data networks.

21. GBT assisted in developing wireless solutions in the wireless marketplace and certain wireless technologies, including a wireless multi-media service using GBT's technology known as Code Division Multiple Access technology or "GB-CDMA". GBT also co-chaired a standardization committee that developed 3G technologies.

22. In 1998, after the announcement that 3G would be standardized based on UMTS, GBT invested additional resources designed to make the 3G UMTS environment more efficient and faster.

23. In 2001, many of GBT's technical innovations and contributions were ultimately adopted by 3GPP as an important and necessary part of the 3G and UMTS standards. 3GPP articulated these global standards in several documents, including one document entitled "3GPP; Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD)", of which there have been several releases.

24. GBT's contributions to the 3G UMTS global standards greatly enhanced the efficiency with which data could be transmitted and was integral in enabling rapid, efficient connections of UMTS compliant mobile devices to a UMTS compliant 3G network.

25. As a result of being adopted as part of the standard for 3G and UMTS, certain of GBT's technology is necessarily required for any use of a 3G UMTS compliant mobile device.

26. GBT, desiring to protect its technology, sought patents from the United States Patent and Trademark Office.

27. On February 6, 1998, GBT filed the '793 patent application and on June 13, 2000, the United States Patent & Trademark Office duly and legally issued United States Letters Patent No. 6,075,793 entitled "HIGH EFFICIENCY SPREAD SPECTRUM SYSTEM AND

METHOD". A true and correct copy of the '793 patent is attached hereto as Exhibit A and incorporated herein by reference.

28. The '793 patent describes a multichannel-spread-spectrum system for communicating a plurality of data-sequence signals from a plurality of data channels using parallel chip-sequence signals in which fewer than all of the channels include header information. A header device concatenates a header to a first data sequence signal on a first channel. Data-sequence signals in parallel channels are sent without a header, and are timed from the header in the first channel. By sending data through parallel spread-spectrum channels, while including headers in fewer than all of the channels, the invention increases data transmission efficiency.

29. The '793 patent claims certain of GBT's contributions to the 3G UMTS standards required by the IMT-2000 and articulated by 3GPP.

## DEFENDANT HTC'S UNAUTHORIZED USE OF THE MULTICODE PATENT

30. HTC is designs and manufactures electronic products, including smartphones. HTC's sales revenue totaled $2.2 billion for 2005, a 102% increase from the previous year. It has been listed as the fastest growing technology company in BusinessWeek's Info Tech 100.

31. HTC makes, uses, sells, offers for sale and/or imports into the United States certain mobile stations which are configured to allow connection to 3G UMTS compliant wireless networks. Those mobile stations manufactured, used, sold, offered for sale and/or imported by HTC that are configured to allow connection to 3G UMTS compliant wireless networks include the HD2 and HD7 devices.

32. HTC makes, uses, sells, offers for sale and/or imports into the United States certain mobile stations which are configured to allow connection to 3G UMTS compliant wireless networks.

ME1 14131992v.1

Those mobile stations manufactured, used, sold, offered for sale and/or imported by HTC that are configured to allow connection to 3G UMTS compliant wireless networks include the Surround, Aria, Pure and Tilt2 devices.

33.     At least as early as April 15, 2009, GBT contacted HTC by letter, informing HTC that certain of GBT's patented technology was required by the standard articulated by 3GPP and offering HTC the opportunity to license GBT's patents.

34.     HTC has not, to date, taken a license or otherwise obtained GBT's permission to use GBT's patented technology.

## CLAIM FOR RELIEF AGAINST HTC
## FOR INFRINGEMENT OF U.S. PATENT NO. 6,075,793

35.     Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1-34 of this Complaint as though fully set forth herein.

36.     Plaintiff GBT is the owner by assignment of the entire right, title, and interest, including the right to enforce the '793 patent.

37.     HTC has directly infringed and continues to directly infringe the '793 patent by making, using, selling, or offering for sale in or importing into the United States mobile station devices used within UMTS compliant 3G wireless communication networks, which embodies or otherwise practices one or more of the claims of the '793 patent. These mobile devices include but are not limited to the HTC HD2, HD7, Surround, Aria, Pure and Tilt2 devices.

38.     As a direct and proximate result of HTC's infringement of the '793 patent, Plaintiff has been and continues to be damaged in an amount yet to be determined.

39.     HTC has actual notice of the '793 patent owned by GBT, and has had actual notice of the '793 patent owned by GBT since at least as early as May 2012 when GBT sued HTC in the Central District of California for its infringement of the '793 patent.

40. HTC has not had, nor does it have a reasonable basis for believing that it had or has the right to engage in the acts complained of herein.

41. HTC's infringement has been willful and deliberate, making this an exceptional case and justifying the award of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by a jury of twelve pursuant to Rule 38 of the Federal Rules of Civil Procedure as to all issues in this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against each Defendant as follows:

1. For a judicial determination and declaration that each of the Defendants has infringed and continues to infringe the Patent-in-Suit by making, using, importing, offering for sale, and/or selling mobile devices that are used to connect to UMTS compliant 3G networks in the United States.

2. For a judicial determination and decree that each of the Defendants' infringement of the Patent-in-Suit is willful;

3. For damages resulting from each of the Defendants' past and present infringement of the Patent-in-Suit and the trebling of such damages because of the willful and deliberate nature of its infringement;

4. For a declaration that this is an exceptional case under 35 U.S.C. § 285 and for an award of attorneys' fees and costs in this action;

5. For an assessment of prejudgment interest; and

6. For such other and further relief as the Court may deem just and proper under the circumstances.

Dated: September 18, 2012						MCCARTER & ENGLISH, LLP

/s/ Michael P. Kelly
Michael P. Kelly (DE #2295)
Daniel M. Silver (DE #4758)
Renaissance Centre
405 N. King Street 8th Floor
Wilmington, DE 19801
Tel: (302) 984-6300
Fax: (302) 984-6399
mkelly@mccarter.com
dsilver@mccarter.com

*Attorneys for Plaintiff*
*Golden Bridge Technology, Inc.*